**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| In re: Francisco Antonio Tello and Nataliya Tello,<br><br>    Debtors. | Bankruptcy No.: 20-30330<br><br>Chapter 7 |
| Global Financial & Leasing Services, LLC,<br><br>    Plaintiff,<br><br>vs.<br><br>Francisco Antonio Tello and Nataliya Tello,<br><br>    Defendants. | Adversary No.: 20-7031 |

**MEMORANDUM AND ORDER**

GFRS Equipment Leasing Fund, I, LLC (GFRS) filed an Adversary Complaint, alleging Debtors/Defendants Dr. Francisco Antonio Tello and Nataliya Tello exhibited a pattern of willful and deliberate concealment of assets, omitted assets from their bankruptcy schedules and fraudulently transferred assets with intent to hinder, delay and defraud GFRS. It sought an order denying Debtors their bankruptcy discharge under 11 U.S.C. § 727(a)(2), (3) and (4). In their Answer, Debtors denied GFRS was entitled to the relief it sought.

Before trial of this adversary proceeding in January 2022, GFRS assigned its claim to Global Financial & Leasing Services, LLC (GFLS). GFRS filed a motion to substitute GFLS as Plaintiff. The Court granted the motion. Doc. 56. GFLS pursued all

of the claims in the Adversary Complaint at trial.  Debtors offered evidence supporting their defenses.

This adversary action is a core proceeding under 28 U.S.C. § 157(b)(2)(I).  The Court has jurisdiction under 28 U.S.C. §§ 1334 and 157, and it has authority to enter a final order in this matter.  This opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## I.   FACTS

### A.   General Background

Debtors Francisco and Nataliya are married and live in Bismarck, North Dakota.  Francisco and Nataliya met in Ukraine, Nataliya's native country.  Nataliya and her son from a previous marriage, Bogdan Nechepurenko, moved to the United States 14 years ago when Francisco and Nataliya married.  Bogdan is now 31 years old.

Francisco worked for 18 years as a podiatrist for medical providers in Bismarck.  In 2015, he formed North Dakota Foot and Ankle Institute, P.C.  Francisco was the sole owner of this professional corporation.  Initially, North Dakota Foot and Ankle operated out of a clinic in Bismarck.  Later, Francisco moved the practice to Mandan, North Dakota.  North Dakota Foot and Ankle closed on June 30, 2021.

### B.   Equipment Lease and Pre-Bankruptcy Litigation

North Dakota Foot and Ankle entered into a lease agreement with GFLS on April 18, 2015, for the use of an Orthoscan Mobile DI Mini C System, a device used for taking x-ray images.  Ex. 282 at 4.[1]  Francisco signed a personal guaranty for the lease agreement.  Nataliya is not listed as a lessee or guarantor.

---

[1] Global Financial & Leasing Services, LLC (GFLS) originated the lease between GFLS and Francisco Tello.  After the parties signed the lease and before filing the state

Within a few months after leasing the equipment, North Dakota Foot and Ankle struggled to make payments.  At Francisco's request, GFLS agreed to modify the lease to lower the monthly payment for several months.  Id. at 29.  North Dakota Foot and Ankle's financial difficulties continued, prompting three more modifications.  Id. at 29-32. Even after amending the terms of the lease agreement four times, North Dakota Foot and Ankle failed to make the payments when due.  Dakota Foot and Ankle made its last voluntary payment in December 2016.

On March 24, 2017, GFLS sent Francisco a letter notifying him that North Dakota Foot and Ankle was in default, demanding cure payments and requesting Francisco to "peacefully relinquish" the equipment.  Several weeks later, Francisco signed and sent a North Dakota Foot and Ankle check for $2,880 to GFLS.  North Dakota Foot and Ankle's bank dishonored the check due to insufficient funds.  Reportedly, Francisco promised to deliver a $2,880 cashier's check to replace the dishonored check, but this did not occur.  After sending Francisco several more email demands and a notice of lease default, GFRS (which received the lease assignment from GFLS) filed a lawsuit in June 2017 with the Superior Court for the State of Arizona seeking damages for breach of contract and an order for specific performance requiring the delivery of the leased equipment.  GFRS named "Jane Doe Tello" as a defendant in its complaint even though her name does not appear on the lease or lease guaranty and it alleged no facts suggesting she was a member of North Dakota Foot and Ankle.  The only allegation pertaining to "Jane Doe Tello" was: "Defendant Doctor Francisco Antonio Tello (Dr.

---

court lawsuit against Debtors, GFLS assigned the lease to GFRS Equipment Leasing Fund, I, LLC (GFRS).  Sometime before trial, GFRS assigned the obligations back to GFLS.

Tello), and upon information and belief, his wife Jane Doe Tello … , at all times material to the claims asserted in the Complaint, were acting for the benefit of Doctor Francisco Antonio Tello and their marital community and caused events to occur in Maricopa County, Arizona, which give rise to this complaint."  Ex. 282 at 2.

On August 31, 2017, the Arizona state court entered an Order of Default Judgment in favor of GFRS and against North Dakota Foot and Ankle, Francisco and Jane Doe Tello a/k/a "Natalya" (sic) Tello, jointly and severally.  Ex. 211.  In the judgment, the Arizona state court ordered Defendants to return the Orthoscan to GFRS and entered a monetary judgment in favor of GFRS in the principal amount of $124,746.05, plus post-judgment attorneys' fees, interest and other costs, totaling $132,827.61.  On October 20, 2017, GFRS filed an authenticated copy of the judgment in Burleigh County, North Dakota.

After obtaining the judgment, GFRS began aggressive efforts to collect the debt. In late 2017 or early 2018, it applied for an order with the North Dakota District Court, South Central Judicial District, County of Burleigh, requiring Debtors to appear for a debtor's examination.  The North Dakota state court issued a summons for a debtor's examination of Francisco and Nataliya on January 9, 2018.  Debtors failed to appear at the debtor's examination scheduled for January 30, 2018, prompting the North Dakota state court to issue a bench warrant for Debtors' arrest.  Francisco was arrested and briefly incarcerated.  The North Dakota state court rescheduled the examination.

On March 22, 2018, Francisco and Nataliya both appeared for the rescheduled debtor's examination, which the North Dakota court supervised.  Ex. 213.  During the examination, GFRS asked about the location of the Orthoscan equipment.  Francisco

explained that he moved the equipment from the Bismarck clinic where North Dakota

Foot and Ankle took possession of it to the Mandan address where North Dakota Foot

and Ankle relocated.  Prior to the rescheduled examination, GFLS/GFRS attempted to

repossess the equipment from the Bismarck location without success.  Although the

lease terms required written consent from GFLS prior to moving the equipment,

Francisco did not obtain GFLS's or GFRS's written consent or inform either entity of the

move.[2]  During the examination, GFRS obtained Francisco's assurance that he would

not move the equipment without GFRS's consent, and he would make it available to

GFRS if it elected to repossess it.  Consistent with this assurance, Francisco never

restricted access to the equipment.  GFRS eventually recovered the equipment from the

Mandan clinic location.  It sold the equipment for approximately $11,600 and applied the

proceeds to Debtors' debt.

During the March 2018 debtor's examination, GFRS also collected information

about Debtors' income, personal bank accounts and North Dakota Foot and Ankle

business accounts.  Ex. 213.  Francisco testified that he deposited insurance and other

health care benefit reimbursements into North Dakota Foot and Ankle's account at U.S.

Bank.[3]  GFRS used this information to garnish $2,896.71 from this account on March

---

[2] At trial, Sean Duffy, the CEO/CFO for GFRS and GFLS, testified that he
believed Francisco was hiding the equipment.  Day 2, 1:35:00.  Although GFLS's March
2017 default notice, GFRS's lawsuit and the state court default judgment all demanded
Francisco and North Dakota Foot and Ankle return the Orthoscan equipment, Francisco
claimed "nobody came forward to ask me to surrender" the equipment until the sheriff
arrived at the Mandan clinic sometime after the March 2018 debtor's examination.

[3] At the examination and perhaps through other investigative techniques, GFRS
also learned the names of insurance companies and government entities who owed
North Dakota Foot and Ankle health care reimbursement funds.  GFRS used this
information to garnish $50,000 to $60,000 in reimbursements directly from the payors, a
significant portion of North Dakota Foot and Ankle's income.  "Profit and Loss"

30, 2018.  Ex. 213 at 11; Ex. 237 at 13.  The following month, Francisco withdrew

$3,000.00 in six $500.00 cash increments from this account, leaving only $218.48

subject to GFRS's second garnishment on April 27, 2018.  Ex. 237 at 19-20.

Review of U.S. Bank accounts ending in 4167 and 4159 from January 2018 to

June 2020 reveals that Francisco routinely withdrew cash from these North Dakota Foot

and Ankle business accounts.  In fact, he withdrew cash on more than 150 occasions

totaling more than $55,000, nearly $25,000 within one year of the petition date.  From

2018 to 2020, GFRS garnished only $4,933.58 from these business accounts.

Francisco claims he withdrew the cash to pay bills or living expenses, not to avoid

garnishments.[4]  Other than information included on the bank statements and

---

statements for 2019 and 2020 show that, of the $86,966.69 in gross income in 2019,
North Dakota Foot and Ankle received $61,965.47 of that sum from insurance
reimbursement.  Ex. 228.  Similarly, in 2020, $69,124.94 of North Dakota Foot and
Ankle's $100,491.78 in gross income was derived from insurance reimbursement.  Ex.
253.

[4] Francisco's explanations for how he spent this cash are inconsistent.  At his
Rule 2004 examination in November 2020, Francisco testified that he withdrew cash
from the U.S. Bank account to deposit those funds into North Dakota Foot and Ankle's
Starion bank account.  Ex. 284.  When asked whether there were any other reasons for
the cash withdrawals, he replied "no."  He testified that, for every dollar withdrawn from
the U.S. Bank business accounts, there should be a deposit in the Starion account—
although not always on the same day for the same sum.  Ex. 284 at 45.  Francisco
clarified that approximately $5,000 in payments to attorneys in 2020 were the only
exceptions to this general practice.  Review of the U.S. Bank and Starion business bank
accounts reveals that Francisco regularly deposited cash in the Starion account, but
these deposits do not always correlate with U.S. Bank cash withdrawals.  Further, it is
apparent that Francisco deposited significantly less cash into the Starion account than
he withdrew from the U.S. Bank accounts—over $35,000 less.  Exs. 237, 238, 239, 240,
241, 242, 246, 247, 248.

In his discovery responses dated July 29, 2021, Francisco represented that he
used the cash withdrawn from the U.S. Bank accounts for business and personal
expenses.  Ex. 230 at 11.  At trial, Francisco maintained that he used the U.S. Bank

rudimentary "Profit and Loss" statements for 2019 and 2020 showing business expenses, he provided no documentation showing how he spent this cash.[5]

At the March 2018 debtor's examination, GFRS also learned that Francisco received $3,300 per month from a pension fund.  GFRS garnished the Wells Fargo account where the pension fund deposited the pension payments.  Following the garnishment, either Francisco or Wells Fargo closed the account,[6] and Francisco arranged for the pension payments to be sent by check to his home address.  According to Sean Duffy, the CEO/CFO for GFRS and GFLS, Francisco was always "one step ahead."

In April 2018, GFRS served interrogatories on Debtors and North Dakota Foot and Ankle seeking financial information, including a list of all checking, savings and investment accounts.  Debtors failed to respond, leading GFRS to file a motion to compel answers.  The North Dakota state court issued an order requiring Debtors to answer the interrogatories within 21 days.  Ex. 216 at 3-4.  Debtors failed to comply. GFRS sought contempt sanctions, prompting the North Dakota state court to schedule a hearing on GFRS's motion for contempt sanctions on October 26, 2018.

_____

accounts only for business expenses.  The business-related payments reportedly included reimbursing the Tellos for business debts paid from personal funds.

[5] Other than bank statements, Francisco kept no records of his cash expenditures showing which expenditures were business related and which, if any, were personal.  He also kept no records showing payments, reimbursements, or refunds to North Dakota Foot and Ankle related to personal expenses.  Ex. 230 at 14, No. 23.

[6] Francisco testified that Wells Fargo closed the account when the account balance reached zero.

The day before the hearing, Debtors filed an unsigned response to the interrogatories dated April 28, 2018.  Ex. 215; Ex. 216 at 3.  Despite the last-minute interrogatory responses, the state court granted GFRS's motion for contempt for failure to comply with the court order and ordered Debtors to pay $3,240 within 30 days.  Ex. 217.

In their answers to interrogatories served in April 2018, Debtors disclosed the following accounts:

- Wells Fargo, closed July 2018 (ending in 3504),

- Gate City Bank, opened in July 2018 (ending in 1724), and

- U.S. Bank, opened in April 2015 (ending in 4167).

At the hearing, Francisco testified "under penalties of perjury" that Debtors' responses, including the list of bank accounts, were accurate, "based on the date of October 23, 2018."[7]  Ex. 216 at 5-7.  This representation proved to be incorrect.

Frustrated by Debtors' lack of cooperation with its collection efforts, GFRS served garnishment pleadings on many of the financial institutions in the Bismarck/Mandan community in February 2019.  Ex. 256, 257, 258.  It discovered the following accounts Debtors had not previously disclosed:

- U.S. Bank, opened in March 2015 (ending in 4134, 4142 and 4159)

- American Bank Center, opened on June 25, 2018 (ending in 9668)

- Starion Bank, opened on April 19, 2018 (ending in 0782)

---

[7] During the contempt hearing, the state court asked, "And do you state under penalties of perjury that the responses you have provided are true and accurate responses based on the information, based on the date of October 23, 2018?" Francisco answered, "Yes."  Ex. 216 at 5-6.

- Choice Financial, opened June 11, 2018 (ending in 5907).

Exs. 255, 256, 257, 258.

When asked at trial why he did not list all accounts in his answers to interrogatories, Francisco replied, "The answers to these interrogatories were typed out on April 28 of '18. On April 28 of '18, those answers were correct."  Notably, Francisco opened the Starion account and three of the U.S. Bank accounts Debtors failed to disclose before the April 28, 2018, date listed on the responses.  Also, Debtors' responses indicate the Wells Fargo account was closed in July 2018, and Debtors opened the Gate City account in July 2018—months after Francisco "typed out" the responses.

Francisco also explained that he did not include the Choice Financial account in the April 2018 responses because Nataliya is the holder of that account.  This explanation overlooks the fact that GFRS served the interrogatories on Francisco, Nataliya and North Dakota Foot and Ankle, and he titled the April 28, 2018, discovery responses "Defendants Answers to Plaintiff's Interrogatories," suggesting all Defendants, including Nataliya, submitted the responses.  Exs. 214, 215.

At trial, Francisco admitted that his April 28, 2018, discovery responses were not correct the day he testified at the October 26, 2018, contempt hearing despite his representations to the contrary.  By way of explanation, he noted that he was not law trained and did not know he was required to supplement his discovery responses.

GFRS sent a second set of interrogatories to Debtors on August 8, 2019, which Debtors disregarded until December 2019, when Francisco hand-delivered signed but unnotarized answers to the interrogatories.  It appears that an order by the North

9

Dakota state court dated November 20, 2019, compelling Debtors to respond to these interrogatories, prompted Debtors to respond.

### C.   Settlement Efforts

At trial, Francisco and Duffy both claimed they were interested in reaching a settlement agreement in the years before this adversary proceeding.  According to Duffy, in approximately March 2018, Francisco offered to pay $2,500 immediately and $2,000 per month until he paid the judgment in full in exchange for GFRS "dropping the judgment."  Francisco testified that he extended at least three offers in early March 2018.  GFRS declined the offers but indicated it was interested in continuing to discuss settlement.  At this time, GFRS had not yet recovered the Orthoscan equipment.

Duffy believed Francisco extended his next settlement offer in July 2019. Francisco reportedly offered to pay $2,000 per month for 18 months to resolve GFRS's claims.  GFRS rejected this offer as well.

Francisco extended his final offer in March 2021.  According to Duffy, Francisco explained that his circumstances had changed dramatically, and he offered $5,000 immediately and $5,000 in two months to GFRS to settle all claims.  None of the negotiations resulted in a settlement agreement, and GFRS continued to pursue collecting the debt.

### D.   Bankruptcy Disclosures

On June 4, 2020, Debtors filed a voluntary joint petition for bankruptcy relief under Chapter 7 of the Bankruptcy Code.  Bankr. Case No. 20-30330.  Gene Doeling, the Chapter 7 Trustee assigned to Debtors' case, held the first meeting of creditors on July 9, 2020.  Debtors testified that they signed the petition and understood they were

both responsible for providing accurate information.  Debtors never amended their

bankruptcy schedules after filing their initial schedules.

In its Adversary Complaint, GFRS alleges that Debtors failed to disclose assets

in their bankruptcy case consistent with their pattern of willful and deliberate

concealment of assets and unlawful transfers of assets.  It highlights Debtors'

concealment of payments to Nataliya, transfers and gifts to Bogdan, payments to

Francisco and other assets Debtors failed to disclose as examples of their efforts to

avoid paying their debt to GFRS.  At the time of trial, Debtors' debt to GFRS totaled in

excess of $50,000, exclusive of attorney fees, costs and interest.

### 1.      Payments to Nataliya Tello

Debtors represented in Schedule I that Nataliya was not employed on the petition

date.  Ex. 223.  In their Statement of Financial Affairs, Debtors reported that Nataliya

received no income from employment or from operating a business in 2020 or the two

previous calendar years, and that she received no other income in 2020 or the two

previous calendar years.  Ex. 223 at 24-25.  Nataliya's bank records reflect cash and

check deposits from a variety of sources.  Debtors disclosed none of the following

payments on their bankruptcy schedules or Statement of Financial Affairs.

### a.      Payments from Mark Roningen or Yelena Roningen

Mark Roningen and Yelena Roningen met Debtors in 2018.  Yelena is originally

from Russia.  Nataliya and Yelena, who share Russian and Ukrainian heritage, became

friends.  As a result of Nataliya and Yelena's friendship, Mark and Francisco also

became friends.  Mark works for Knife River as a business development manager.  He

also owns a cleaning business, Professional Cleaning Services, which he has operated

since approximately 2018.  He referred to Professional Cleaning Services as "kind of a little ma-and-pa organization."  Roningen Depo. at 12.

Mark and Yelena perform most of the services for Professional Cleaning Services.  Occasionally, they sought the assistance of other people, including Nataliya, during vacations or when the company received a bigger cleaning project.  Professional Cleaning Services did not employ Nataliya or secure oral or written contracts with her for cleaning services.  Id. at 44.  According to Mark, Nataliya assisted Professional Cleaning Services with cleaning projects beginning in 2019.  The business paid Nataliya and others "ballpark around $20 an hour" in exchange for their cleaning services.  Id. at 19.  Mark paid Nataliya by check and typically wrote "cleaning" on the memo line.  Id. at 22-23.  He does not pay anyone in cash.  Id. at 28.

At trial, Nataliya agreed that she only received checks, not cash, from the Roningens.[8]  After receiving a payment, she either gave the money to Bogdan or deposited it at Gate City Bank in her personal account.  Ex. 285 at 67.

Debtors' bank records reflect the following checks Mark or Yolena Roningen issued to Nataliya Tello:

| | | | |
|---|---|---|---|
| 1. | January 25, 2019 | memo: Peterson/Apple Candle | $200.00 |
| 2. | July 1, 2019 | memo: cleaning | $260.00 |
| 3. | August 15, 2019 | memo: cleaning | $300.00 |
| 4. | September 26, 2019 | memo: blank | $300.00 |
| 5. | February 14, 2020 | memo: cleaning | $350.00 |
| 6. | February 14, 2020 | memo: blank | $40.00 |
| 7. | August 30, 2020 | memo: blank | $240.00 |
| 8. | September 28, 2020 | memo: blank | $300.00 |

---

[8] During her deposition on November 18, 2020, Nataliya testified that Mark paid her with cash or a check. Ex. 285 at 67.  During this deposition, she also testified that she has been cleaning houses for income since March 2019, she receives $20 per hour for her services, and she only cleans houses for the Roningens.  Ex. 285 at 61-68.

**Total:**                                                              **$1,990.00**

Ex. 249; Ex. 203.

During his deposition, Mark confirmed that the January 2019, July 2019, August 2019 and February 2020 checks to Nataliya were payments for cleaning services. Roningen Depo. at 30-33.  At trial, Nataliya claimed these checks may have been payments for help with cleaning (but "not income from cleaning"), or they may have been reimbursements for items she purchased for Yelena.  Examples of items she purchased for Yelena include shoes, items from Russian grocery stores in Minneapolis or everyday items from Costco.  Mark explained that the February 14, 2020, check for $40 and the August 30, 2020, check for $240 were reimbursements for items from the Russian grocery store or other items Nataliya purchased.  Id. at 20, 44.

During trial, Debtors gave inconsistent testimony regarding whether Francisco knew about Nataliya's cleaning income from the Roningens.  Francisco claimed he was "not aware" that Nataliya received payments from the Roningens for cleaning commenting, "That's between her and her girlfriend."  According to Nataliya, Francisco knew about her cleaning income.

### b.    Cash Deposits

Nataliya deposited cash into her personal BNC account (account ending in 2064, designated by *) and into Debtors' joint Gate City Bank account (ending in 1724) on the following occasions:

1.  January 23, 2018                                    $320.00*
2.  April 21, 2018                                      $500.00
3.  August 7, 2018                                      $400.00*
4.  September 11, 2018                                  $100.00
5.  April 23, 2019                                      $400.00
6.  June 11, 2019                                       $1,000.00
7.  August 20, 2019                                     $470.00

| | | |
|---|---|---|
| 8. | August 29, 2019 | $2,500.00 |
| 9. | October 28, 2019 | $2,000.00 |
| 10. | December 16, 2019 | $250.00 |
| 11. | June 12, 2020 | $300.00 |
| 12. | January 12, 2021 | $42.17 |
| 13. | June 2, 2021 | $1,000.00 |
| 14. | July 16, 2021 | $2,000.00 |
| | **Total:** | **$11,282.17** |

Ex. 249.  Nataliya claimed that Francisco gave her cash for household expenses and occasionally her parents in Ukraine gave her cash.  She also testified that, from time to time, Bogdan's biological father also gave her cash to give to Bogdan.

### c.  Payments from William Clairmont

Nataliya also received numerous checks from William Clairmont in 2017 and 2018.  She maintains that these checks were reimbursements for purchases she made on behalf of William Clairmont and his wife.  Nataliya explained that Mrs. Clairmont gave Nataliya English language lessons.  In return, Nataliya ran errands for the Clairmonts.  The errands included clothes shopping, grocery shopping, dry cleaning and car cleanings.  Nataliya paid for the purchases or services, and the Clairmonts reimbursed her for the expenses and for the gasoline she used running the errands.

A list of the checks Nataliya received from William Clairmont follows:

| | | |
|---|---|---|
| 1. | October 4, 2017 | $324.95 |
| 2. | October 11, 2017 | $328.45 |
| 3. | October 18, 2017 | $322.10 |
| 4. | October 24, 2017 | $154.90 |
| 5. | October 30, 2017 | $312.50 |
| 6. | November 9, 2017 | $332.40 |
| 7. | November 15, 2017 | $305.85 |
| 8. | November 21, 2017 | $369.10 |
| 9. | November 28, 2017 | $256.05 |
| 10. | December 5, 2017 | $306.30 |
| 11. | December 12, 2017 | $306.03 |
| 12. | December 20, 2017 | $321.25 |
| 13. | December 27, 2017 | $333.40 |

| | |
|---|---|
| 14. January 5, 2018 | $157.15 |
| 15. January 10, 2018 | $150.00 |
| 16. January 16, 2018 | $306.05 |
| 17. January 22, 2018 | $160.75 |
| 18. January 29, 2018 | $309.90 |
| 19. February 6, 2018 | $308.90 |
| 20. February 13, 2018 | $303.50 |
| 21. February 19, 2018 | $311.90 |
| 22. February 28, 2018 | $302.45 |
| 23. March 7, 2018 | $266.35 |
| 24. March 13, 2018 | $241.05 |
| 25. March 20, 2018 | $303.50 |
| 26. March 28, 2018 | $303.15 |
| 27. April 3, 2018 | $304.20 |
| 28. April 10, 2018 | $315.25 |
| 29. April 18, 2018 | $273.50 |
| 30. April 25, 2018 | $318.90 |
| **Total:** | **$8,303.75** |

Ex. 249; Ex. 250.

### d.    North Dakota Foot and Ankle

North Dakota Foot and Ankle employed Nataliya as a part-time bookkeeper beginning in 2015.  Ex. 213 at 19; Ex. 249 at 1.  At the debtor's examination in March 2018, both Nataliya and Francisco testified that Nataliya's only income at that time was from North Dakota Foot and Ankle, where she performed bookkeeping services.  Ex. 213 at 19.  North Dakota Foot and Ankle paid her a salary approximately every six months by check.  Ex. 213 at 14.

On their bankruptcy schedules filed on June 4, 2020, Debtors did not disclose that Nataliya was employed or that Debtors anticipated any increase or decrease in income.  Ex. 223 at 20.  Shortly after Debtors filed their bankruptcy petition in June 2020, North Dakota Foot and Ankle resumed paying Nataliya for her bookkeeping services.  Nataliya testified that she "started" bookkeeping in July 2020, but other evidence suggests that she had performed bookkeeping services from 2015 to 2020,

15

some compensated, some uncompensated. She received a $369.40 check for her June work on or about July 4, 2020. Debtors failed to inform the bankruptcy trustee that Nataliya received this income at the July 9, 2020, meeting of creditors. At trial, Francisco conceded that Nataliya had received one payment five days before the meeting of creditors and claimed the failure to disclose it was an "honest mistake." After the check in July, North Dakota Foot and Ankle continued to issue Nataliya regular checks for her work.

Several months later during her 2004 examination on November 18, 2020, Nataliya testified that she "kind of" volunteered her bookkeeping and cleaning services at North Dakota Foot and Ankle. Ex. 285 at 22. She did not disclose that she was receiving wages at the time. Id. at 22, 55. To the contrary, she denied receiving wages at the time of the 2004 examination and years prior, claiming that she was "not really" an employee of the clinic and she received no paychecks. Id.

### 2.    Transfers and Gifts to Bogdan Nechepurenko

Bogdan, Nataliya's son, attends the University of North Dakota. In addition to attending college, he works at a restaurant earning cash tips and an hourly wage.

Sometime between June 3 and June 5, 2020, Debtors gave Bogdan $5,000 in cash.[9] Nataliya explained that she gave the money to Bogdan to pay for two semesters

---

[9] Nataliya testified at trial that she gave $5,000 to Bogdan on June 3, 2021, the day before Debtors filed their bankruptcy petition. Day 2 Rec. 2:46. Francisco testified that he "gave Bogdan some money" and affirmed that he withdrew $5,000 before filing the bankruptcy petition, but that he gave that cash to Bogdan after filing the bankruptcy petition. Day 1 Rec. 5:02. During examination from his attorney, Francisco admitted that he was not sure if it was on June 3 or June 5. He explained that he first told the Trustee at the meeting of creditors that it was June 5, but at the continued meeting of creditors, he told him it was June 3. Day 2 Rec. 1:53.

of tuition.  Bogdan deposited $5,000 into his Gate City Bank account on June 12, 2020.

Ex. 210.  According to Bogdan, Nataliya often gave him money to help him with his

living expenses and college tuition.  More specifically, Nataliya gave him between

$2,500 and $5,000 approximately every semester or two.  Nechepurenko Depo. at 34.

Debtors also paid his cell phone expenses in 2018 and 2019.  Debtors did not disclose

any payments, transfers or gifts to Bogdan (or for his benefit) in their bankruptcy

schedules or statements filed June 9, 2020.  See Ex. 223 p. 26-28.

At the July meeting of creditors, Debtors disclosed the $5,000 transfer to

Bogdan.  They also represented to the Trustee that they did not make any payments to

Bogdan within the year before filing their bankruptcy petition on June 4, 2020, other

than the $5,000 payment.  Day 2 Rec. 2:32; Day 1 Rec. 5:03.  Contrary to these

representations, Nataliya gave Bogdan a check for $2,500 on August 23, 2019.  Ex.

207.  Nataliya and Bogdan both testified that the $2,500 came from Bogdan's biological

father who lives in Ukraine.  They explained that Bogdan's father sent cash to Nataliya,

who transferred the money to Bogdan by writing him a check.

Evidence received at trial also shows Nataliya wrote two $400 checks to Edward

Jones, where Bogdan holds an account.  Nataliya and Bogdan explained that these

checks were birthday gifts to Bogdan.  Debtors gave at least one of these birthday gifts

to Bogdan in April 2019, within two years before they petitioned for bankruptcy relief.

The other check is undated.

### 3.    Payments from Darrin Jordahl to Francisco Tello

Darrin Jordahl and Francisco Tello are friends.  They met more than 15 years

ago when Debtors purchased lake property next to Jordahl.  Jordahl works as a

contractor in Bismarck, mostly remodeling residential bathrooms.  Jordahl Depo. at 6.

He owns SDJ Investments, LLC and New Look Remodeling Company, which also does business as Five Star Bath Solutions.  Id. at 7, 32-33.  According to Jordahl, Francisco was an employee of New Look Remodeling at some point in approximately 2016.[10]  Id. at 8.  Francisco also assisted with construction projects at Jordahl's residence in Bismarck from 2018 to 2021.  Id. at 10-11.  Francisco received $7,592 in checks from Jordahl between January 2018 and March 2021:

| | | |
|---|---|---|
| 1. | January 6, 2018 | $175.00 |
| 2. | January 14, 2018 | $175.00 |
| 3. | March 10, 2018 | $200.00 |
| 4. | March 16, 2018 | $200.00 |
| 5. | March 16, 2018 | $200.00 |
| 6. | April 4, 2018 | $400.00 |
| 7. | April 6, 2018 | $280.00 |
| 8. | April 15, 2018 | $412.00 |
| 9. | April 27, 2018 | $125.00 |
| 10. | May 5, 2018 | $350.00 |
| 11. | June 10, 2018 | $250.00 |
| 12. | June 16, 2018 | $150.00 |
| 13. | July 4, 2018 | $175.00 |
| 14. | July 10, 2018 | $150.00 |
| 15. | October 16, 2018 | $300.00 |
| 16. | February 20, 2019 | $300.00 |
| 17. | March 11, 2019 | $500.00 |
| 18. | April 23, 2019 | $300.00 |
| 19. | May 22, 2019 | $150.00 |
| 20. | February 12, 2020 | $450.00 |
| 21. | April 27, 2020 | $300.00 |
| 22. | June 24, 2020 | $500.00 |
| 23. | August 23, 2020 | $675.00 |
| 24. | February 21, 2021 | $625.00 |
| 25. | March 27, 2021 | $250.00 |
| | **Total:** | **$7,592.00** |

---

[10] Francisco worked in the construction industry building houses for four to five years early in his career before he attended medical school.

Ex. 201.  Jordahl explained that he paid Francisco for his time in addition to reimbursing

Francisco for the cost of materials he purchased for Jordahl stating, "It would be fair to

say that more than 50 percent would have been for his help, his time."  Jordahl Depo. at

15-24.  For general labor, Jordahl paid Francisco $100 for a half day or $200 for a full

day of work.  Id. at 16-17.  Jordahl also testified that he paid Francisco generously

because he appreciated the help and because Francisco let Jordahl park a construction

trailer on Francisco's property.  Jordahl could not recall ever paying Francisco in cash.

Debtors did not disclose Jordahl's payments to Francisco on Schedule I or their

Statement of Financial Affairs.  At trial, Francisco claimed that the payments from

Jordahl were not income; they were mostly reimbursement for materials.  He testified

that the money Jordahl characterized as compensation for labor or "help" in addition to

reimbursement for materials was merely a "thank you" for helping a friend.  Francisco

claims that he did not disclose these payments on his bankruptcy schedules or

statements because he did not consider them income.  In support of this claim, he

emphasized that he was not Jordahl's employee, he received no salary or hourly wage,

and the parties signed no contract obligating Jordahl to pay him.

### 4.    Additional Bankruptcy Nondisclosures

Debtors did not disclose certain assets on their bankruptcy schedules, including

an E*TRADE account in Francisco's name and a John Deere lawn and garden tractor.

Additionally, they did not disclose all payments to their attorney on their Statement of

Financial Affairs, and they represented that they had a $300 monthly household

expense on Schedule J that North Dakota Foot and Ankle routinely paid before Debtors

petitioned for bankruptcy relief.

> a. **E\*TRADE (a/k/a Capital One Investment Funds) Account in Francisco Tello's Name**

When asked why Debtors failed to disclose an E\*Trade account [11] in Francisco's name, Francisco claimed the money in the account belonged to Bogdan.[12]

During his trial deposition, Bogdan confirmed that his money is deposited in the E\*TRADE account. Prompted by Francisco's advice, Bogdan purportedly saved cash from his employment and "put some of it away" in the E\*TRADE stock account he and Francisco "share." Nechepurenko Depo. at 15-16. According to Bogdan, Francisco deposited all the money in the account, purchased stocks and managed the account for Bogdan. Bogdan claimed he accessed the E\*TRADE account by logging onto the website, but he conceded that he used Francisco's credentials to access the account. Despite his ability to access the account, Bogdan never executed trades through the account or personally deposited funds into the account.

When asked about the mechanics of transferring money to the E\*TRADE account, Bogdan confused the E\*TRADE account with his stock investments "on Webull," claiming he transferred funds from his Gate City Bank account to the investment account. Id. at 17-18.[13] Ultimately, he claimed: "I just leave the cash with --

---

[11] Francisco explained that this E\*TRADE account was "merged" with the Capital One Investing, LLC, account (ending in 6767). Both parties referred to the Capital One Investing account and the E\*TRADE account as the same account.

[12] Debtors did not disclose the E\*TRADE account in Schedule A/B or in response to question 23 on the Statement of Financial Affairs, which asks, "Do you hold or control any property that someone else owns? Include any property you borrowed from, are storing for, or hold in trust for someone." Ex. 223 at 6, 28.

[13] Bogdan testified: "It's an E-TRADE. It's just like a stock website. I just put the money -- just the cash into -- to the bank and just buy some -- he -- he buys stocks once in a while. It's not that many, I don't believe." Nechepurenko Depo. at 16.

some cash with [Francisco] once in a while once I see him like in Bismarck, and then he -- he actually makes the -- I'm not sure how he does that." Id. at 18.  Bogdan was uncertain when he started giving Francisco cash to invest, changing his guess from 2018 to 2017 to 2016.  Id. at 19.  He knew the total sum Francisco invested for him (approximately $2,000) based on the E*TRADE account statement; he did not independently keep track of the cash he claims he gave to Francisco.  Id. at 20.

Francisco acknowledged that he opened the E*TRADE account and the account listed only his name, but he claimed he was "nothing more than a supervisor" of the account.  Ex. 265.  Francisco testified that he did not invest his money into the E*TRADE account declaring, "I have absolutely no money in it."  Notably, Francisco claimed E*TRADE account losses on his 2020 tax return.  Ex. 283 at 5; Ex. 265 at 48. He also withdrew funds from the E*TRADE account on several occasions to pay for goods at Walmart.  Exs. 251, 265.  And, although Bogdan testified that he gave Francisco cash "once in awhile" to invest in the account, Francisco's account statements suggest more routine investments.  E*TRADE account statements and Francisco's Wells Fargo account statements show more than 20 recurring transfers of $200 from Francisco's Wells Fargo account into the E*TRADE account (also known as the Capital One Investment Funds account).  Ex. 251; Ex. 265.

### b.  John Deere Lawn and Garden Tractor

Francisco purchased a John Deere lawn tractor approximately 19 years ago for six to seven thousand dollars.  He has not used the tractor in a year and a half because it is "not working."  Francisco claims he did not disclose it on his bankruptcy schedules because it is "a hunk of junk."  Debtors paid $1,000 to the bankruptcy trustee to retain the nonexempt lawn tractor.

### c.    Payments to Debtors' Attorney

In response to a question on the Statement of Financial Affairs regarding whether Debtors paid anyone who they consulted about seeking bankruptcy relief or preparing a bankruptcy petition, Debtors disclosed that they paid their bankruptcy attorney's law firm $1,665.  Ex. 223 at 27.  Debtors' bank records reveal that they paid a total of $4,000 to the law firm within the year prior to filing their bankruptcy petition.

At trial, Francisco represented that he paid his attorney $2,000 for the basic bankruptcy.  He explained that, during the consultation period before he petitioned for bankruptcy relief, he sought the advice of his attorney to avoid filing a bankruptcy petition, and his attorney provided advice during the collection activities.  He testified that he paid his attorney additional fees for advice that "had nothing to do with the bankruptcy."

### d.    Expense on Schedule J

Debtors listed a $300 expense on Schedule J for "Telephone, cell phone, internet, satellite, and cable services."  Ex. 223 at 22.  Francisco admitted that North Dakota Foot and Ankle paid this expense for at least nine months prior the bankruptcy petition.  During the first day of trial, Francisco claimed he was confused by the question and explained that the question on Schedule J did not specify whether this expense was business or personal.  On the second day of trial, he explained that, as of the petition date, Debtors anticipated that they would personally pay the telecommunications bill going forward because the business generated no revenue at that time.

## II.    CONCLUSIONS OF LAW

GFLS seeks a denial of Debtors' discharge under 11 U.S.C. § 727(a)(2), (3) and

(4).  Section 727(a) of the Bankruptcy Code provides, in relevant part, that the court

shall grant a debtor a discharge unless:

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer
> of the estate charged with custody of property under [the Bankruptcy Code],
> has transferred, removed, destroyed, mutilated, or concealed, or has
> permitted to be transferred, removed, destroyed, mutilated, or concealed—
>
>> (A) property of the debtor, within one year before the date of the filing
>> of the petition; or
>>
>> (B) property of the estate, after the date of the filing of the petition;
>
> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to
> keep or preserve any recorded information, including books, documents,
> records, and papers from which the debtor's financial condition or business
> transactions might be ascertained, unless such act or failure to act was
> justified under all of the circumstances of the case;
>
> (4) the debtor knowingly and fraudulently, in or in connection with the
> case—
>
>> (A) made a false oath or account[.]

11 U.S.C. § 727(a).  Denying a debtor a discharge is a harsh remedy.  Home Serv. Oil

Co. v. Cecil (In re Cecil), 542 B.R. 447, 451 (B.A.P. 8th Cir. 2015) (citation omitted).

Therefore, courts construe section 727 strictly in favor of the debtor.  Id.  Even so, a

discharge in bankruptcy and the associated fresh start are privileges, not rights.  Bauer

v. Iannacone (In re Bauer), 298 B.R. 353, 357 (B.A.P. 8th Cir. 2003) (citing Grogan v.

Garner, 498 U.S. 279, 286 (1991)).  "The opportunity for a completely unencumbered

new beginning is limited to the honest but unfortunate debtor."  Id.  The cost to the

debtor for an unencumbered fresh start is minimal, but it includes honestly and

accurately disclosing his or her financial affairs and cooperating with the trustee.  Id.;

see also 11 U.S.C. § 521 (listing a debtor's duties in bankruptcy).  "To prevail in an action to deny a debtor's discharge, the objecting party must prove each element under § 727 by a preponderance of the evidence."  Kaler v. Charles (In re Charles), 474 B.R. 680, 683-84 (B.A.P. 8th Cir. 2012) (citing Allred v. Vilhauer (In re Vilhauer), 458 B.R. 511, 514 (B.A.P. 8th Cir. 2011)). To meet this standard, the movant must show the existence of a fact is more probable than its nonexistence.  Northland Nat'l Bank v. Lindsey (In re Lindsey), 443 B.R. 808, 812 (B.A.P. 8th Cir. 2011).

### A.  **11 U.S.C. § 727(a)(2)**

To prevail under section 727(a)(2)(A), GFLS must prove by a preponderance of the evidence: (1) the actions took place within one year before the petition date; (2) the actions were that of Debtors; (3) Debtors transferred, removed, destroyed, mutilated or concealed property; and (4) Debtors took these acts with an intent to hinder, delay or defraud a creditor or the Trustee.  See Georgen-Running v. Grimlie (In re Grimlie), 439 B.R. 710, 716 n.11 (B.A.P. 8th Cir. 2010); Kaler v. Huynh (In re Huynh), 392 B.R. 802, 810 (Bankr. D.N.D. 2008).  "'Once a gratuitous transfer is shown, the burden then shifts to the debtor to prove his intent was not to hinder, delay, or defraud his creditors.'" Cadlerock Joint Venture II, L.P. v. Sandiford (In re Sandiford), 394 B.R. 487, 490 (B.A.P. 8th Cir. 2008) (quoting The Abbott Bank-Hemingford v. Armstrong (In re Armstrong), 931 F.2d 1233, 1239 (8th Cir. 1991)).

To prevail under section 727(a)(2)(B), the Trustee must prove:

> (1) the act serving as the basis for the claim took place . . . after the petition for relief (subsection B);

> (2) the act was that of Debtor;

> (3) the act amounted to a transfer, removal, destruction, mutilation or concealment of property of the bankruptcy estate; and

24

(4) the act was done with an intent to hinder, delay, or defraud a creditor or the trustee.

Wilson v. Walker (In re Walker), 515 B.R. 725, 750 (Bankr. W.D. Mo. 2014), aff'd, 528 B.R. 418 (B.A.P. 8th Cir. 2015) (footnote omitted) (citing Kaler v. Hentz, (In re Hentz), 2013 WL 1197616 at *8 (Bankr. D.N.D. March 24, 2013)).  The elements of proof under paragraphs (A) and (B) are "virtually the same, differing only in the requisite timing of the debtor's acts and the nature of the property involved." Id.  If the court finds a debtor's omissions from schedules and statements are concealment, the omissions may be considered a prepetition concealment of property of the debtor under section 727(a)(2)(A) or a continuing concealment of property of the estate under section 727(a)(2)(B).  Manchester v. Easly (In re Easly), 2021 WL 346228, at *4 (Bankr. W.D. Okla. Feb. 1, 2021); Arvest Bank v. Dokes (In re Dokes), 2017 WL 1743498, at *19 (Bankr. E.D. Ark. May 2, 2017); Cox v. Cox (In re Cox), 2013 WL 66282, at *3 (Bankr. N.D. Ohio Jan. 4, 2013); U.S. Tr. v. Lebahn (In re Lebahn), 2004 WL 726915 (Bankr. N.D. Iowa Mar. 2, 2004).

**1.    GFLS met its burden of showing that Debtors transferred or concealed their property within one year before the petition date.**

a.    Francisco transferred or concealed his property within one year before the petition date.

GFLS offered evidence showing Francisco concealed property by failing to disclose an E*TRADE account, income he received from Jordahl for construction labor and an old lawn tractor on Debtors' bankruptcy schedules and statements.[14]  GFLS also

---

[14] GFLS also claims Debtors failed to disclose more than $2,000 in transfers to their attorney before bankruptcy.  Francisco testified that his attorney provided advice regarding GFLS's collection efforts and that he paid his attorney for this advice, which

established that Francisco withdrew cash and deposited some of these funds in other

bank accounts, preventing or delaying discovery and garnishment of this money.

Debtors concede they failed to disclose the lawn tractor, but they maintain they were not

required to disclose the E*TRADE account or the payments from Jordahl.  Debtors

acknowledge that Francisco regularly withdrew cash from his U.S. Bank business

accounts and deposited the cash in the Starion business account, but Debtors assert

that the purpose of these withdrawals was to pay business expenses.

In support of their claim that they were not required to disclose payments

Francisco received from Jordahl, Debtors maintain that most of the payments were

reimbursements for construction supplies Francisco purchased for Jordahl and the rest

of the funds were a "thank you" for helping a friend.  They argue that the "gratuitous"

funds paid for construction labor do not qualify as "income" as that term is used in part

2, question 5 of the Statement of Financial Affairs.  Using this logic, they assert they

were not required to list these payments and failure to do so is not concealment under

section 727(a)(2)(A).

The Court rejects Debtors' argument for two reasons.  First, Debtors offered no

authority suggesting that gifts or gratuitous payments are not "income" they are required

---

"had nothing to do with bankruptcy."  The Court finds Francisco's testimony on this
issue credible and rejects GFLS's assertion that Debtors concealed prepetition
payments to their attorney in violation of section 727(a)(2)(A).  The Court also rejects
GFLS's argument that Debtors improperly listed a $300 monthly expense for telephone,
cell phone, internet, satellite and cable services on Schedule J.  Francisco conceded
that North Dakota Foot and Ankle paid these expenses prepetition, but he maintained
that the business generated no income at the time of petition, so Debtors planned to
pay the expense in the future.  GFLS offered no evidence showing that North Dakota
Foot and Ankle routinely paid these expenses after the petition date, and the Court finds
Francisco's testimony on this issue credible.

to disclose in their Statement of Financial Affairs.  There is authority to the contrary, however.[15]

Second, the Court is not convinced that the funds Jordahl paid to Francisco for his labor were gifts.  Review of Jordahl's testimony, which the Court finds credible, reveals that more than 50 percent of the funds Jordahl paid Francisco were to compensate Francisco for his time.  This compensation for labor qualifies as income regardless of whether Debtor received a 1099, hourly wage or proposed contract.  See Web Holdings, LLC v. Cedillo (In re Cedillo), 573 B.R. 451 (Bankr. E.D.N.Y. 2017)

---

[15] See Premier Cap., LLC v. Wyman (In re Wyman), 573 B.R. 318, 341 (Bankr. D. Mass. 2017) (debtor claimed $133,383 he received from his daughter was a gift and not income; court denied discharge under section 727(a)(4) because debtor failed to disclose the gifts as income on Schedule I and the Statement of Financial Affairs); Pergament v. Gonzalez (In re Gonzalez), 553 B.R. 467, 474-75 (Bankr. E.D.N.Y. 2016) (debtors' false oaths included failure to report income from $45,000 in gifts from family on the Statement of Financial Affairs); Neary v. Streckmann (In re Streckmann), 2013 WL 3712440, at *3 (Bankr. N.D. Tex. Jul. 12, 2013) (denying discharge under section 727(a)(4) for nondisclosures including indirect income in the form of gifts); Deangelis v. Von Kiel (In re Von Kiel), 461 B.R. 323, 341 (Bankr. E.D. Pa. 2012) (debtor's false oaths included disclosing only a portion of the gifts he received as income under question 1 on the Statement of Financial Affairs); Oberg v. Chrispin (In re Chrispin), 2012 WL 3126807 (Bankr. N.D. Ill. Jul. 31, 2012) (recognizing that although the Bankruptcy Code does not define "income," the term has been defined to include money or other form of payment that one receives from employment, business, investments, royalties, gifts and the like); Shinhan Bank Am. (Inc.) v. Kim (In re Kim), 2011 WL 5902461, at *7 (Bankr. N.D. Ga. 2011) (looking to Black's Law Dictionary's definition of "income"—"[t]he money or other form of payment that one receives, usu. periodically, from employment, business, investments, royalties, gifts, and the like"—and denying debtor's discharge under section 727(a)(4) because she failed to disclose $360,000 of income under either question 1 or 2 on the Statement of Financial Affairs that she claimed was from loans, loan repayments, reimbursements and gifts because she did not consider it "income"); Benchmark Bank v. Crumley (In re Crumley), 428 B.R. 349 (Bankr. N.D. Tex. 2010) ("The inclusion of items such as income tax refunds and child support payments make it clear–that "income" for purposes of Question 2 is intended to reach many distributions beyond the scope of gross income as defined by the Internal Revenue Code. . . As listed in the Instructions, the scope of Question 2 is consistent with the legal definition of "income" as receipts "from employment, business, investments, royalties, gifts, and the like." (internal citations omitted)).

(debtor's failure to disclose small amounts of income from "side jobs" was a false oath);

Clean Cut Tree Serv., Inc. v. Costello (In re Costello), 299 B.R. 882 (Bankr. N.D. Ill.

2003) (finding debtor's failure to disclose additional income he earned from snow

removal jobs was a false oath among numerous misrepresentations and omissions

sufficient to deny discharge); Weese v. Lambert (In re Lambert), 280 B.R. 463 (Bankr.

W.D. Mo. 2002) (denying debtor's discharge under section 727(a)(4) for failing to

disclose income from part-time construction work); In re Sullivan, 204 B.R. 919 (Bankr.

N.D. Tex. 1997) (finding debtor should have disclosed additional income apart from the

income received from the operation of debtor's business; and emphasizing that income

means all income).

    Francisco had a duty to disclose this income in the Statement of Financial

Affairs and his refusal to divulge information about this source of income to GFLS

prepetition and on the schedules and statements filed in Debtors' bankruptcy case

qualifies as concealment.[16]

---

[16] Concealment under section 727(a)(2)(A) or (B) involves placing assets beyond the reach of creditors or withholding knowledge of assets by failing or refusing to divulge information about the existence, ownership or location of the assets.  See, e.g., In re Marcus-Rehtmeyer, 784 F.3d 430, 442 (7th Cir. 2015) (defining concealment as "preventing discovery, fraudulently transferring or withholding knowledge or information required by law to be made known" (citation omitted)); McCormick v. Sec. State Bank, 822 F.2d 806 (8th Cir. 1987) (finding concealment within the meaning of section 727(a)(2)(A), noting "It is admitted by appellant in his testimony that he lied to the bank when he claimed to be unable to make any payment on the note and that he did not disclose to the bank that $55,000 to $60,000 was subject to his disposition at that time. . . . But concealment from the creditor alone, (here the appellee bank), is sufficient to constitute concealment under the statute when the intent to hinder and delay collection is clear, as it is in the case at bar."); Buckeye Ret. Co., LLC v. Swegan (In re Swegan), 383 B.R. 646, 655 (B.A.P. 6th Cir. 2008) ("To give effect to each word in the statute, as we must, we conclude that concealment as used in § 727(a)(2)(A) includes the withholding of knowledge of an asset by the failure or refusal to divulge information required by law to be made known."); R.I. Depositors Econ. Prot. Corp. v. Hayes (In re

Next, Debtors argue that they were not required to disclose the E*TRADE account in Francisco's name because they do not own the funds deposited in it. Instead, they claim that the funds belong to Bogdan.  With this response, Francisco failed to acknowledge that he neglected to disclose the E*TRADE account in response to question 23 on the Statement of Financial Affairs, which asks, "Do you hold or control any property that someone else owns?  Include any property you borrowed from, are storing for, or hold in trust for someone."  Ex. 223 at 28.  Accordingly, the Court rejects Debtors' assertion that they were not required to disclose the E*TRADE account.

---

Hayes), 229 B.R. 253 (B.A.P. 1st Cir. 1999) (defining concealment under section 727(a)(2)(A) as "hiding or withdrawing property from observation, preventing the discovery of property or withholding knowledge of the existence, ownership or location of property." (quotation and citation omitted)); Gasson v. Premier Capital, LLC (In re Gasson), 2021 WL 1222151, at *5 (S.D.N.Y. Mar. 31, 2021) ("To ascertain whether a concealment for the purposes of Section 727(a)(2) has occurred, courts ask: '[d]id the [debtor] place assets beyond the reach of creditors or withhold knowledge of assets by failing or refusing to divulge information to which creditors were entitled?'" (citation omitted)); Barbacci v. Miller (In re Miller), 2020 WL 2554232, at *3 (Bankr. N.D. Ohio May 19, 2020) ("A 'concealment as used in § 727(a)(2)(A) includes the withholding of knowledge of an asset by the failure or refusal to divulge information required by law to be made known.  Under this standard, concealment occurs when a debtor fails to adequately and truthfully answer a question at a state-court debtor's examination, at a 341 meeting of creditors, within a bankruptcy petition, or in other similar situations.'" (citations omitted)); Weatherall Radiation Oncology v. Caletri (In re Caletri), 517 B.R. 655, 666-67 (Bankr. E.D. La. 2014) ("Concealing debtor property includes conduct such as placing assets beyond the reach of creditors or withholding knowledge of the assets by failure or refusal to divulge information." (footnote omitted)); Flush Sav. Bank v. Vidro (In re Vidro), 497 B.R. 678, 686 (Bankr. E.D.N.Y. 2013) ("'Concealment refers to placing assets beyond the reach of creditors or withholding pertinent information, and need not involve an actual transfer.'" (citation omitted)); In re Kantorik, 475 B.R. 233 (Bankr. W.D. Pa. 2012) ("Concealment has been defined as "placing assets beyond the reach of creditors or withholding knowledge of the assets by failure or refusal to divulge owed information."); Wieland v. Miller (In re Miller), 448 B.R. 551, 572 (Bankr. N.D. Okla. 2011) (finding that assuming control over and relocating estate assets without informing the creditors of the location of the property was concealment under section 727(a)(2)(A)).

The Court is also not persuaded that Francisco held no interest in the funds deposited in the account.  While Bogdan may have delivered some of his money to Francisco to deposit in the account, the evidence suggests Francisco contributed some of his money to the account and treated the account as his own.  Francisco acknowledged that he opened the E*TRADE account, and the account listed only his name.  He claimed E*TRADE account losses on his 2020 tax return.  Ex. 283 at 5; Ex. 265 at 48.  He also withdrew funds from the E*TRADE account on several occasions to pay for goods at Walmart.  Exs. 251, 265.  And, although Bogdan testified that he gave Francisco cash "once in awhile" to invest in the account, Francisco's account statements suggest more routine investments.  E*TRADE account statements and Francisco's Wells Fargo account statements show more than 20 recurring transfers of $200 from Francisco's Wells Fargo account into the E*TRADE account (also known as the Capital One Investment Funds account).  Ex. 251; Ex. 265.  Even Bogdan referred to the E*TRADE account as one he shares with Francisco.  Further, the Court finds both Bogdan's and Francisco's testimony claiming that Bogdan was the sole owner of the funds in the E*TRADE account completely lacking in credibility.  Rather, the Court is convinced Francisco held an ownership interest in the account, and his refusal to disclose this interest on his schedules and statements is concealment.  <u>See</u> note 16, <u>supra</u>.

In response to GFLS's claim that Francisco withdrew cash from North Dakota Foot and Ankle's business accounts and deposited some of it in North Dakota Foot and Ankle's business account at Starion to avoid GFLS's garnishment, Francisco argues that he withdrew cash to pay bills or living expenses.  He claims he did not transfer

these funds to avoid garnishment.  Withdrawing funds from one account and moving

them to another account is a transfer under section 727(a)(2).  Freelife Int'l, LLC v.

Butler (In re Butler), 377 B.R. 895, 917–18 (Bankr. D. Utah 2006) (defining transfer

under section 727(a)(2) as "any disposition of an interest in property which includes a

transfer of possession, custody, or control even if there is no transfer of title and which

also includes deposits to, withdrawals from, and transfers between bank accounts or

similar accounts").[17]  Further, Francisco's withdrawal of funds from the business

accounts at U.S. Bank to pay business or personal expenses does not absolve him of a

section 727(a)(2) violation.  See Rose v. Reaves (In re Rose), 574 B.R. 141, 153 (D.

Ariz. 2017) (finding that withholding funds from one creditor to pay another does not

"absolve the debtor" of a section 727(a)(2) violation) (citation omitted); Locke v. Schafer

(In re Schafer), 294 B.R. 126 (N.D. Cal. 2003) (finding violation of section 727(a)(2)

despite debtor's argument that he was merely preventing one creditor from attaching his

funds so that he could pay all of the other creditors).

          b.      Nataliya concealed property within one year before the
                  petition date.

GFLS also offered evidence that Nataliya concealed property by failing to

disclose prepetition and postpetition income she received or anticipated receiving from

---

[17] See also Rose v. Reaves (In re Rose), 574 B.R. 141, 150–51 (D. Ariz. 2017)
(finding that the debtor's transfer of funds to an account in the name of a non-debtor
third party beyond the reach of the debtor's creditors was a disposition by transfer under
section 727(a)(2)(A) and that the debtor's payment of attorneys, accountants and other
creditors from this account was a second transfer under section 727(a)(2)(A)); James v.
Tipler (In re Tipler), 360 B.R. 333, 341 (Bankr. N.D. Fla. 2005) (finding the debtor's
deposit of $120,000 into a joint account with his wife was a transfer under section
727(a)(2)).

Mark Roningen for cleaning services.[18]  Nataliya testified that the checks she received

from Mark Roningen were for help with cleaning but "not income from cleaning" or they

were reimbursements for items she purchased for Yelena Roningen.  Debtors argue

that the "gratuitous" funds paid for "help" with cleaning do not qualify as "income" as that

term is used in part 2, question 5 of the Statement of Financial Affairs.  Using this logic,

they assert that they were not required to list these payments and failure to do so is not

concealment under section 727(a)(2)(A).  Debtors also emphasize that Nataliya

received no contract from Mark Roningen, she was not an employee and the checks

she received were not tied to anything.

The Court rejects Debtors' argument for two reasons.  As with Francisco's

income from Jordahl, Debtors offered no authority suggesting that gifts or gratuitous

payments are not "income" they are required to disclose in their Statement of Financial

Affairs.  But, as noted above, there is authority to the contrary.  See note 15, supra.

Second, the record shows that Mark Roningen paid Nataliya $20 per hour as

compensation for her cleaning services on at least three occasions and likely more.

These checks for her work are "income," regardless of whether Mark Roningen

employed Nataliya, issued her a 1099, asked her to sign a contract, infrequently

requested her services or paid her a small sum of money.  See Web Holdings, LLC v.

---

[18] GFLS also offered evidence showing Nataliya received 30 payments by check
from William Clairmont between October 2017 to April 2018, more than two years
before Debtors petitioned for bankruptcy relief.  Nataliya testified that these payments
were reimbursements for gasoline and purchases she made on behalf of the
Clairmonts.  GFLS offered no evidence rebutting this evidence, and the Court finds her
testimony on this issue credible.  The Court rejects GFLS's argument that Nataliya
failed to disclose "income" from William Clairmont or concealed these reimbursements
under section 727(a)(2)(A).

Cedillo (In re Cedillo), 573 B.R. 451 (Bankr. E.D.N.Y. 2017) (debtor's failure to disclose

small amounts of income from "side jobs" was a false oath).  Nataliya had a duty to

disclose this income in the Statement of Financial Affairs and her refusal to divulge

information about this source of income during the bankruptcy case qualifies as

concealment.  See note 16, supra.

> c.    Debtors transferred or concealed property within one year
> before the petition date.

Finally, GFLS demonstrated that Francisco and Nataliya concealed property by

failing to disclose money they gifted or transferred to Bogdan in their Statement of

Financial Affairs filed June 9, 2020.  Debtors testified that they gave Bogdan $5,000 in

cash on June 3, 2020, the day before they filed their bankruptcy petition.[19]  Nataliya

explained that she gave the money to Bogdan to pay for two semesters of tuition.

According to Bogdan, Nataliya often gave him between $2,500 and $5,000

approximately every semester or two to help him with his living expenses and college

tuition.  Debtors also paid his cell phone expenses in 2018 and 2019.

Debtors argue that they were not required to disclose transfers to Bogdan for

college-related expenses because they made these transfers in the "ordinary course" of

their business and financial affairs, and question 18 on the Statement of Financial

Affairs does not require Debtors to disclose such transfers.  There is no precise test to

---

[19] Although Francisco testified that Debtors gave the money to Bogdan on June 5, 2020, at the first meeting of creditors, he changed his testimony at the continued meeting to clarify that the transfer occurred on June 3, 2020.  At trial, Francisco was not sure if the transfer occurred on June 3 or June 5.  Given Nataliya's testimony that the transfer occurred on June 3 and Francisco's testimony at the continued meeting of creditors that the transfer occurred on June 3, the greater weight of the evidence suggests that Debtors gave Bogdan $5,000 on June 3, 2020.

determine whether transfers are in the "ordinary course."  See Dooley v. Luxfer MEL Tech. (In re Fansteel Foundry Corp.), 617 B.R. 322, 325 (B.A.P. 8th Cir. 2020).  Courts consider consistency with other business transactions between the parties; the history of dealing between the parties; whether the payment was customary or regularly occurring; whether the transfer at issue involved an unusual payment method or resulted from atypical pressure to pay; the length of time the parties were engaged in the transactions at issue; whether the amount or form of tender differed from past practices; whether one of the parties engaged in any unusual collection or payment activity; and whether the creditor took advantage of the debtor's deteriorating financial condition.  See In re Fansteel Foundry Corp., 617 B.R. at 325; In re Laclede Steel Co., 271 B.R. 127, 132 (8th Cir. BAP 2002); Rice v. M-Real Estate LLC (In re Turner Grain Merch., Inc.), 595 B.R. 295, 307 (Bankr. E.D. Ark. 2018); Ostosh v. Ostosh (In re Ostosh), 589 B.R. 319, 350 (Bankr. W.D. Mich. 2018).   "The purpose of the exception is 'to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.'"  Schnittjer v. A.Y. McDonald Industries, Inc. (In re McDonald), 2021 WL 1234456, at *6 (Bankr. N.D. Iowa Mar. 30, 2021) (quoting Cent. Hardware Co. v. Sherwin-Williams Co. (In re Spirit Holding Co.), 153 F.3d 902, 904 (8th Cir. 1998)).   "'The ordinary course of business defense should be narrowly construed.'"  Schnittjer v. A.Y. McDonald Indus., Inc. (In re McDonald), 2021 WL 1234456, at *6 (Bankr. N.D. Iowa Mar. 30, 2021) (citations omitted).

Bogdan's and Nataliya's testimony suggesting Debtors gave Bogdan money

"every semester or two," without any other evidence showing the consistency, timing

and number of transfers substantiating this claim is insufficient to show "ordinary

course."[20]  Further, the $5,000 transfer to Bogdan on the eve of bankruptcy suggests

atypical financial stress motivated the payment, not consistent business practice.

Additionally, most courts reject the proposition that regularly paying college expenses

qualifies as an exception to the disclosure requirements under the theory that the

transfers are in the "ordinary course" of their business and financial affairs.  See e.g.,

Snyder v. Dykes (In re Dykes), 2018 WL 5819371 (Bankr. D. Minn. Feb. 26, 2018), aff'd,

590 B.R. 904 (B.A.P. 8th Cir. 2018), aff'd, 954 F.3d 1157 (8th Cir. 2020) (finding debtors

violated section 727(a)(4)(A) when they failed to disclose transfers made for their adult

children's tuition and living expenses in their Statement of Financial Affairs despite their

testimony that these payments were made in the "ordinary course").[21]

---

[20] During closing argument, Debtors conceded that they did not offer evidence showing that payments to Bogdan for college expenses were regular or routine.

[21] See generally Wilson & Muir Bank & Tr. Co. v. Eifler (In re Eifler), 2013 WL 3300639 (Bankr. W.D. Ky. Jul. 1, 2013), aff'd sub nom. Eifler v. Wilson & Muir Bank & Tr. Co., 2014 WL 314473 (W.D. Ky. Jan. 28, 2014), aff'd, 588 F. App'x 473 (6th Cir. 2014) (finding debtor failed to disclose tuition pre-payments under Number 10 ("Other Transfers" covering transfers outside of the ordinary course of business) or Number 7 ("Gifts" made within a year of bankruptcy); and concluding that because of numerous misrepresentations and omissions debtor's discharge should be denied under section 727(a)(4)); Villa Oaks, LLC v. Shakir (In re Shakir), 623 B.R. 532 (Bankr. N.D. Ill. 2021) (finding a false statement under section 727(a)(4) where debtor failed to disclose children's tuition payments in his Statement of Financial Affairs); E. Sav. Bank, FSB v. Hansen (In re Hansen), 2018 WL 1587538 (Bankr. N.D. Ill. Mar. 28, 2018) (finding a false statement under section 727(a)(4)(A) where debtor failed to disclose in his Statement of Financial Affairs substantial gifts or transfers to or for the benefit of family members within one year of petition date, including tuition payments for his son's college education).

To summarize, Debtors neither disclosed the E*TRADE account, transfers to Bogdan and income from Jordahl and Roningen in their schedules or Statement of Financial Affairs nor amended them to disclose these assets or transfers.  Under the circumstances of this case, this failure or refusal to divulge information is concealment. Additionally, Francisco withdrew cash from the U.S. Bank business accounts and transferred or spent it to avoid garnishment.  Accordingly, GFLS established the first three elements of its section 727(a)(2) cause of action.

> **2.    GFLS met its burden of showing that Debtors transferred or concealed property with intent to hinder, delay or defraud a creditor or an officer of the estate.**

The next question is whether Debtors concealed the assets and transfers they should have disclosed with intent to hinder, delay or defraud GFLS.  Because a debtor rarely admits to fraudulent intent, a party seeking denial of discharge must generally rely on a combination of circumstances, or "badges of fraud," that suggest the debtor harbored the necessary intent.  Ritchie Cap. Mgmt., LLC v. Stoebner, 779 F.3d 857, 861 (8th Cir. 2015); Stoebner v. Ritchie Cap. Mgmt., L.L.C. (In re Polaroid Corp.), 472 B.R. 22, 55-56 (Bankr. D. Minn. 2012); In re Huynh, 392 B.R. at 810.  The Eighth Circuit Court of Appeals has looked to the "badges of fraud" for help in determining actual intent "'regardless of whether the intent language came from a state fraudulent transfer statute or applicable bankruptcy law.'"  Ritchie, 779 F.3d at 861 (citations omitted).

Under North Dakota law, the "badges of fraud" or factors include:

> a.  The transfer or obligation was to an insider;
>
> b.  The debtor retained possession or control of the property transferred after the transfer;
>
> c.  The transfer or obligation was disclosed or concealed;

    d.  Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

    e.  The transfer was of substantially all the debtor's assets;

    f.  The debtor absconded;

    g.  The debtor removed or concealed assets;

    h.  The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

    i.  The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

    j.  The transfer occurred shortly before or shortly after a substantial debt was incurred; and

    k.  The debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

N.D.C.C. § 13-02.1-04.  This list is similar to those cited in bankruptcy cases.  See, e.g.,

Helena Chem. Co. v. Richmond (In re Richmond), 429 B.R. 263, 305 (Bankr. E.D. Ark.

2010); Doeling v. O'Neill (In re O'Neill), 550 B.R. 482, 500 (Bankr. D.N.D. 2016); In re

Huynh, 392 B.R. at 810.[22]  These lists are not exhaustive, and courts are free to

consider "any factors they deem relevant to the issue of fraudulent intent."  Ritchie, 779

F.3d at 863 (in the context of a fraudulent transfer action under 11 U.S.C. §

---

[22] The "badges of fraud" cited in In re Huynh are:  "(1) lack or inadequacy of consideration; (2) family, friendship or other close relationship between the transferor and transferee; (3) retention of possession, benefit or use of the property in question; (4) financial condition of the transferor prior to and after the transaction; (5) conveyance of all of the debtor's property; (6) secrecy of the conveyance; (7) existence of trust or trust relationship; (8) existence or cumulative effect of pattern or series of transactions or course of conduct after the pendency or threat of suit; (9) instrument affecting the transfer suspiciously states it is bona fide; (10) debtor makes voluntary gift to family member; and (11) general chronology of events and transactions under inquiry."  Kaler v. Huynh (In re Huynh), 392 B.R. 802, 810 (Bankr. D.N.D. 2008).

548(a)(1)(A))[23] (quoting <u>Jensen v. Dietz</u> (<u>In re Sholdan</u>), 217 F.3d 1006, 1009–10 (8th Cir. 2000)); <u>Dunker v. Bachman</u> (<u>In re Bachman</u>), 2017 WL 3098093, at * 4 (Bankr. D. Neb. July 20, 2017).

The presence of a single badge is typically not sufficient to establish actual fraudulent intent. <u>Brown v. Third Nat'l Bank</u> (<u>In re Sherman</u>), 67 F.3d 1348, 1354 (8th Cir. 1995). The confluence of several badges, however, creates a presumption of fraudulent intent. <u>Ritchie</u>, 779 F.3d at 861-62; <u>Kelly v. Armstrong</u>, 141 F.3d 799, 802 (8th Cir. 1998); <u>Dantzler v. Zulpo</u> (<u>In re Zulpo</u>), 592 B.R. 231, 247 (Bankr. E.D. Ark. 2018); <u>see also</u> <u>Rademacher v. Rademacher</u> (<u>In re Rademacher</u>), 549 B.R. 889, 894 (Bankr. E.D. Mo. 2016) (noting that the presence of more than one badge of fraud "strongly indicates that the debtor did, in fact, possess the requisite intent.").

Beginning in 2017 when North Dakota Foot and Ankle stopped making voluntary payments required under the Orthoscan lease, GFLS demanded payment and pursued collection of the debt Francisco and North Dakota Foot and Ankle owed it. GFLS sent numerous demand letters, filed a lawsuit, prosecuted its claim and, after entry of default judgment, began aggressive efforts to collect it. Francisco ignored these efforts until he

---

[23] Recognizing the nearly identical wording of Code sections 522(o), 548(a)(1)(A) and 727(a)(2), the Eighth Circuit Court of Appeals and numerous bankruptcy courts apply the same standard of "intent to hinder, delay or defraud" a creditor to cases under these sections. <u>See</u> <u>Addison v. Seaver</u> (<u>In re Addison</u>), 540 F.3d 805, 811-12 (8th Cir. 2008); <u>In re Sholdan</u>, 218 B.R. 475, 481 (Bankr. D. Minn.1998), <u>aff'd</u> 217 F.3d 1006 (8th Cir. 2000) (citing cases) ("The Eighth Circuit has approved the use of the same inferential process in applying the statutory language 'with intent to hinder, delay or defraud creditors,' wherever that language is found—in state fraudulent-transfer statutes, 11 U.S.C. § 548(a), or 11 U.S.C. § 727(a)(2)"). This standard includes the badges of fraud analysis. <u>In re Addison</u>, 540 F.3d at 811-12; <u>Dantzler v. Zulpo</u> (<u>In re Zulpo</u>), 592 B.R. 231, 247 (Bankr. E.D. Ark. 2018) ("Courts have applied the inferential 'badges of fraud' approach to determine whether a debtor acted with fraudulent intent, regardless of which of these provisions is being construed.").

was arrested for failure to appear at a court-ordered debtor's examination.  At or near

the rescheduled debtor's examination in March 2018, the parties discussed a settlement

of their dispute, but they failed to reach an agreement.[24]

Armed with information it learned through the debtor's examination and perhaps

other investigation, GFLS garnished a North Dakota Foot and Ankle account and

Francisco's Wells Fargo account.  GFLS also began garnishing health care

reimbursements owed to North Dakota Foot and Ankle directly from the insurance

companies.  Additionally, it repossessed the Orthoscan.

In turn, Francisco closed the Wells Fargo account, opened new bank accounts

and began regularly withdrawing cash from North Dakota Foot and Ankle's business

accounts and either transferring the cash to the Starion business account or spending it

on business debts or personal expenses.  Review of U.S. Bank accounts ending in

4167 and 4159 from January 2018 to June 2020 reveals that Francisco withdrew cash

on more than 150 occasions totaling more than $55,000, nearly $25,000 within one year

of the petition date.

Debtors argue that Francisco's cash withdrawals and transfers were not intended

to avoid GFLS's garnishments or otherwise hinder, delay or defraud GFLS.  Instead,

they claim Francisco transferred the money to pay business expenses, hoping to

---

[24] Debtors argue that their settlement offers during the March 2018, July 2019 and March 2021 negotiations negate evidence GFLS offered to show intent to hinder, delay or defraud GFLS, claiming the offers show Debtors were trying to pay their debt. The Court is not convinced.  While a debtor's effort to pay a debt is a factor courts consider in the totality of circumstances, the evidence shows Debtors made no genuine efforts to pay GFLS since 2017.  Debtors' settlement offers never resulted in an agreement, and Debtors efforts to evade GFLS's debt collection continued after the March 2018 and July 2019 negotiations, which is more indicative of Debtors' intent than the settlement offers.

maintain his practice and generate income.  Francisco's use of the funds in North

Dakota Foot and Ankle's business accounts to pay creditors other than GFLS does not

negate his intent to hinder, delay or defraud GFLS.  United States Tr. v. Hites (In re

Hites), 2021 WL 5875451 (Bankr. W.D. Wash. Dec. 10, 2021) ("However, where a

debtor transfers money to a third-party account to avoid a collection by a creditor with a

large judgment, courts have held that it does not matter whether the money was then

used for personal expenses.");  First Neb. Bank v. Balfour (In re Balfour), 2020 WL

412184, at *11 (Bankr. D. Neb. Jan. 24, 2020) ("Balfours' use of the grain proceeds to

pay household expenses rather than the Bank does not negate Nolan's intent to hinder,

delay or defraud the Bank.");  Redmond v. Karr (In re Karr), 442 B.R. 785 (Bankr. D.

Kan. 2011) (finding transfers from a corporation, for which debtor was the sole director,

shareholder and officer, to pay debtor's personal expenses were made with the intent to

hinder and delay corporation's creditors within the meaning of section 727(a)(2)(A));

Locke v. Schafer (In re Schafer), 294 B.R. 126 (N.D. Cal. 2003) (finding violation of

section 727(a)(2), despite debtor's argument that he was merely preventing one creditor

from attaching his funds so that he could pay all of the other creditors).  To the contrary,

Francisco's Herculean efforts to avoid paying GFLS to pay others demonstrate his

intent to hinder and delay GFLS.

As the Schafer court explained,

Perhaps the most persistent myth in insolvency law is that it is legitimate for
a debtor to play cat-and-mouse games with a creditor so long as the
debtor's overall intent is to pay his creditors as a whole. If § 727(a) referred
to intent to hinder 'creditors,' then this sort of intent would indeed be a
defense. However, a discharge is to be denied any debtor who has hindered
'a creditor.' Once property is concealed from a single creditor, the debtor
has lost his discharge. It is no defense that he intended to use the concealed
funds to pay other creditors or that his estate as a whole was not diminished.

40

In re Schafer, 294 B.R. at 129 (citation omitted).

In addition to transferring cash, Francisco's refusal to respond to GFLS's prepetition discovery requests show his ongoing efforts to hinder or delay GFLS's collection efforts.  When compelled to provide information, Francisco responded with many incomplete or incorrect answers.  He concealed bank accounts, the E*TRADE investment account and sources of income from GFLS.[25]  Francisco's efforts to protect his assets by concealing income, his interest in the E*TRADE account and gifts to Bogdan continued postpetition when he failed to disclose them in his bankruptcy schedules and statements.

The record also shows Nataliya concealed income she received from Mark Roningen.  She also failed to disclose the money she transferred to Bogdan.  In fact, she not only concealed the $5,000 transfer on the eve of bankruptcy, but also failed to disclose the source and transfer details of the $2,500 to $5,000 she gave him every semester or two.  Nataliya also testified that she often gave the income she received from cleaning to Bogdan, but she did not disclose these gifts on her bankruptcy schedules and statements.

---

[25] Prepetition concealment in the context of state court collection proceedings may also serve as grounds to deny discharge under section 727(a)(2)(A).  See In re Hansen, 2018 WL 1587538, at *21 (citing In re Marcus–Rehtmeyer, 784 F.3d 430, 444 (7th Cir. 2015)) ("In addition, the Plaintiff also points to incomplete responses the Debtor made in connection with a pre-petition state court citation proceeding. Where a debtor conceals property within a year before a bankruptcy petition by making false statements at a hearing on a state court citation to discover assets or by failing to disclose such property in documents required to be delivered or filed in connection with such proceeding, such concealment can furnish a basis to deny discharge under Section 727(a)(2)(A).").

Nataliya's inconsistent testimony regarding her work with North Dakota Foot and Ankle also suggests that she may have concealed prepetition income and shows that she provided untruthful information about postpetition income.  At the debtor's examination in March 2018, Nataliya testified that she worked as a part-time bookkeeper for North Dakota Foot and Ankle beginning in 2015 and her only source of income in March 2018 was from this employment.  Nataliya also disclosed that she was employed by North Dakota Foot and Ankle on an Account Agreement with Gate City Bank dated December 28, 2015.  Ex. 249.  Nataliya continued to perform bookkeeping and cleaning services after March 2018, but Debtors suggest that North Dakota Foot and Ankle stopped paying her for these services.  Notably, from January 2018 to July 2021, Nataliya deposited $11,282.17 in cash into her personal BNC account.  She admits that she received some of the cash from Francisco.  Her explanations regarding the other cash sources lack credibility.

On July 4, 2020, North Dakota Foot and Ankle or Francisco began paying Nataliya for her services—which she failed to disclose in Schedule I or during the July meeting of creditors.  She regularly received paychecks from North Dakota Foot and Ankle after that date.  Although she had received paychecks for the months of July, August, September and October 2020, during her Rule 2004 examination in November 2020, Nataliya testified that she "kind of" volunteered her bookkeeping and cleaning services at North Dakota Foot and Ankle.  Ex. 285 at 22.  She did not disclose that she was receiving wages at the time.  Id. at 22, 55.  To the contrary, she denied receiving wages at the time of the 2004 examination and years prior, claiming that she was "not really" an employee of the clinic, and she received no paychecks.  Id.  Nataliya's

untruthful testimony about her income from North Dakota Foot and Ankle shows her intent to conceal it from GFLS. Likewise, the vague or unbelievable explanations regarding the source of the $11,282.17 in cash deposits shows her intent to conceal the sources.

Although the evidence shows Debtors failed to disclose assets and transfers, they argue that these failures are not material or sufficiently material to warrant denial of discharge—a very harsh remedy. Under section 727(a)(2), the question is not whether an individual omission or transfer is material; the question is whether, after careful review of all the evidence, the totality of circumstances shows Debtors concealed or transferred assets with intent to hinder, delay or defraud. Given Debtors' long history of attempts to evade GFLS's collection efforts, the multiple omissions in their schedules and statements and prepetition discovery responses, the transfer of property to insiders, and their inconsistent and sometimes untruthful testimony, the Court finds Debtors intended to hinder, delay or defraud GFLS. Accordingly, the Court finds that GFLS met its burden of showing that Nataliya and Francisco transferred and concealed property with intent to hinder, delay or defraud GFLS. Francisco and Nataliya's discharge is denied under section 727(a)(2).

### B.   11 U.S.C. § 727(a)(3) and (4)

Section 727(a)(3) bars the entry of discharge if Debtors concealed, destroyed, mutilated, falsified, or failed to keep or preserve any record information, including books, documents, records, and papers, from which the Debtors' financial condition or business transactions might be ascertained, and Debtors' actions or failure to act was not justified under the circumstances. 11 U.S.C. § 727(a)(3). Section 727(a)(4) bars entry of discharge if Debtors knowingly and fraudulently made a false oath in connection

with a case.  11 U.S.C. § 727(a)(4).  Although there is evidence to support these causes

of action, it is not necessary to reach the question of whether Debtors' discharge should

also be denied under subsections 727(a)(3) and (4).

The Court considered all other arguments and deems them to be without merit.

## III.    CONCLUSION

For the reasons stated above, it is **ORDERED** that Debtors are denied a

discharge under 11 U.S.C. § 727(a)(2).  GFLS's causes of action under 11 U.S.C.

§ 727(a)(3) and (4) are dismissed without prejudice because they are moot.

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated:  March 14, 2022.


SHON HASTINGS, JUDGE
UNITED STATES BANKRUPTCY COURT